**File By Fax**

FILED
CLERK, U.S. DISTRICT COURT

**10/5/20**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CS___ DEPUTY

1  WILSHIRE LAW FIRM
2  Bobby Saadian (State Bar No. 250377)
   classaction@wilshirelawfirm.com
3  Justin F. Marquez (State Bar No. 262417)
   justin@wilshirelawfirm.com
4  Thiago Coelho (State Bar No. 324715)
   thiago@wilshirelawfirm.com
5  April Yang (State Bar No. 330951)
   april@wilshirelawfirm.com
6  3055 Wilshire Blvd., 12th Floor
   Los Angeles, California 90010
7  Telephone: (213) 381-9988
   Facsimile: (213) 381-9989
8
   Attorneys for Plaintiff/Relator
9  STEPHEN DAVIS

10

11

12          **UNITED STATES DISTRICT COURT**
13          **CENTRAL DISTRICT OF CALIFORNIA**

14  THE UNITED STATES OF AMERICA, *Ex rel*,    Case No.  **CV20-9162-CBM(AFMx)**
    STEPHEN DAVIS,
15                                             **Filed Under Seal (60 day seal) pursuant**
                   Plaintiffs,                 **to 31 U.S.C. § 3730(b)(2) [False Claims**
16                                             **Act]**
    v.
17                                             **COMPLAINT FOR VIOLATIONS OF**
18  EATON CORPORATION PLC, an Ohio             **THE FEDERAL FALSE CLAIMS ACT (31**
    corporation; EATON AEROSPACE LLC, a        **U.S.C. §§ 3729, *et seq*.)**
19  California limited liability company; and DOES
    1 through 10, inclusive,
20                                             **JURY TRIAL DEMANDED**
                   Defendants.
21

22

23

24

25

26

27

28

---
- 1 -
FALSE CLAIMS ACT *QUI TAM* COMPLAINT

1

## I.

2

## INTRODUCTION

3      1.      This is an action brought on behalf of the United States of America by plaintiff/relator
4   Stephen Davis ("Relator") against defendants Eaton Corporation PLC ("Eaton Corporation") and its
5   subsidiary Eaton Aerospace LLC ("Eaton Aerospace") (collectively, "Defendants") pursuant to the
6   Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").

7      2.      This is an action to recover damages and civil penalties arising from false statements,
8   records and claims made, used, presented and/or caused to be made, used and presented by Defendants
9   and/or their agents, employees and co-conspirators to the federal government in violation of the FCA.
10   During at least the last five years, Defendants violated the FCA by knowingly overestimating labor
11   hours and overcharging clients for work not performed on various contracts for the construction and
12   shipment of aerospace systems and components.  Defendants were informed of the labor estimation
13   errors but fraudulently neglected to notify past clients and contractors or to reimburse or credit them
14   for the prior inflated charges.

15      3.      The FCA provides that any person who knowingly makes, uses, presents, or causes to
16   be made, used or presented, a false or fraudulent claim for payment or approval to an officer,
17   employee, or agent of the United States is liable for a civil penalty of up to $11,000.00 for each claim
18   submitted or paid, plus three times the amount of damages sustained by the United States.  The FCA
19   allows any person having information regarding a false or fraudulent claim against the United States to
20   bring an action for himself (as the "relator") and for the United States, and for him to share in any
21   recovery.

22

23

## II.

24

## JURISDICTION AND VENUE

25      4.      This Court has jurisdiction over this action under the FCA causes of action pursuant to
26   28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3732, the last of which specifically confers jurisdiction on
27   this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

28   ///

FALSE CLAIMS ACT *QUI TAM* COMPLAINT

5.     Venue is appropriate as to the Defendants in that the Defendants can be found, reside and/or transact business in this judicial district, and/or acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendants in the County of Los Angeles. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

6.     Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint. Even to the extent there has been any such public disclosure, Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relator voluntarily disclosed the information upon which the allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. § 3730(e)(4)(A). Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions and this Complaint is based on Relator's direct and independent knowledge. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C. § 3730(e)(4) is inapplicable.

7.     Pursuant to § 3730(a)(2) of the FCA, Relator has provided to the Attorney General of the United States and to the United States Attorney for the Central District of California a statement of all material evidence and information related to the Complaint ("Disclosure Statement").

8.     Pursuant to 31 U.S.C. § 3730(b)(2), this *qui tam* complaint is brought *in camera* and under seal. The *qui tam* complaint is filed under seal for 60 days without service on the defendants during the period to enable the United States: (a) to conduct their own investigation without the defendants' knowledge, and (b) to determine whether to join the action. Relator now brings suit under the FCA for the remedies provided thereunder.

### III.

### THE PARTIES

9.     Relator was employed by Defendants as a Pricing Manager in October 2016. He began a leave of absence related to a disability in January 2019, which continued through March 2020. Prior to his leave, Relator worked in Defendants' Aerospace Group, Fuel & Motion Control Systems

- 3 -

FALSE CLAIMS ACT *QUI TAM* COMPLAINT

1  Division located at 4690 Colorado Blvd., Los Angeles, California 90039.  Relator's responsibilities as
2  a Pricing Manager included making preliminary price proposals to clients and potential clients and
3  providing clients with certifications of operation verifying the number of labor hours performed for
4  each contract in order to bill each client accordingly.

5          10.     Relator was laid off by Defendants in May 2020.  He is currently bringing a wrongful
6  termination lawsuit against Defendants based on claims relating to his disability leave and the
7  possibility that he was terminated because of his knowledge of the information contained in this
8  Complaint.   To Relator's knowledge, there have been no public disclosures of the information,
9  transactions or species of fraud alleged herein.  Relator is the original source of the information, as he
10 has direct and independent knowledge of the information on which the allegations herein are based.

11         11.     Defendant Eaton Corporation PLC (https://www.eaton.com) is a multinational power
12 management company operating in two main sectors: industrial and electrical.  Defendant's corporate
13 headquarters are located at 30 Pembroke Road, Eaton House, Dublin 4, IRL, D04 Y0C2.  Defendant's
14 operational headquarters are located at 1000 Eaton Blvd., Beachwood, Ohio 44122.   Within the
15 industrial sector, Defendant operates three sub-groups: hydraulics, aerospace, and vehicle.   For its
16 clients in the aerospace industry, Defendant manufactures and markets a line of systems and
17 components for hydraulic, fuel, motion control, pneumatic systems and engines.   According to its
18 website, Defendant "sets the industry standard for engineering excellence" with products "power[ing]
19 hundreds of military and commercial aircraft platforms."   Defendant made sales of $21.4 billion in
20 2019 and has over 101,000 employees across more than 175 countries.

21         12.     Defendant Eaton Aerospace LLC is a California limited liability corporation and
22 wholly-owned subsidiary of Eaton.  Eaton Aerospace is headquartered at 9650 Jeronimo Road, Irvine,
23 California 92618.  Defendant designs, manufactures, and integrates hydraulics and motion control
24 components and systems.  Defendant's line of business also includes the manufacturing of search and
25 navigation equipment.   Defendant serves clients in commercial and military aviation, aerospace,
26 military weaponry, marine and off-road markets worldwide.   Defendant has over 3,000 federal
27 contract awards, many from the Department of Defense.  There are 18 prime contractors that use
28 Eaton Aerospace as a sub-contractor, including Sikorsky Aircraft Corporation, Boeing, Lockheed

Martin, and Northrop Grumman Systems.  Currently, Sikorsky is obligated under at least six definitive contracts with the Department of Defense, and both the Army and Navy, in which Defendant is listed as a sub-contractor.  These contracts range from $22.4 million to $11.6 billion for combat rescue helicopters, aircraft components, and technical services.

13.     Defendants have clients in a range of industries and sectors, including but not limited to the federal government, military, and consumer aerospace and aviation.  These are industries and businesses that rely heavily on contractors and sub-contractors, like Defendants, to manufacture and deliver high-quality aviation systems and components and to provide ongoing technical support for such products.  In failing to meet their obligations to charge fair prices, make reasonable pricing proposals, and conduct their business in good faith and through fair dealing, Defendants have operated and conspired to defraud the United States and other industry consumers.

14.     Defendants Eaton and Eaton Aerospace have at all times transacted business in the County of Los Angeles within the State of California.  The violations of law alleged herein have been and are being carried out within the County of Los Angeles and elsewhere in California.

15.     Relator is unaware of the true names of defendants DOES 1 through 10.  Said defendants are sued by fictitious names, and the pleadings will be amended as necessary to show the true names and capacities of the DOE defendants when they are ascertained.  Relator alleges on information and belief that each defendant designated as a "DOE" is legally responsible in some manner for the acts and omissions alleged in this Complaint.  On information and belief, at all relevant times, each defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other defendants, and was engaged with some or all of the other defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other defendants so as to be liable for their conduct with respect to the matters alleged below.

16.     On information and belief, each defendant acted pursuant to and within the scope of the relationships alleged above, and that each defendant knew or should have known about, and authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other defendants.  All of the acts and omissions described herein by any defendant were duly performed by,

- 5 -

FALSE CLAIMS ACT *QUI TAM* COMPLAINT

1   and attributable to, all defendants, each acting as agent, as employee, alter ego and/or under the

2   direction and control of the others, and such acts and omissions were within the scope of such agency,

3   employment, alter ego, direction and/or control.  Any reference herein to any acts of defendants shall

4   be deemed to be the acts of each defendant acting individually, jointly, or severally.

5          17.    The real party in interest to the *qui tam* claims herein is the sovereign government of

6   the United States of America.  Relator is pursuing his causes of action on behalf of the United States

7   pursuant to 31 U.S.C. § 3730(c)(3).  The United States has suffered damages as a result of paying the

8   fraudulent and inflated claims for payment submitted by Defendants.

9

10                                          **IV.**

11                          **THE FEDERAL FALSE CLAIMS ACT**

12          18.    The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be

13   presented to the United States any false or fraudulent claim for payment or approval a violation of

14   federal law for which the United States may recover three times the amount of the damages the

15   government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims

16   made on or after September 29, 1999.

17          19.    The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to

18   be used or made, a false record or statement material to a false or fraudulent claim, a violation of

19   federal law for which the United States may recover three times the amount of the damages the

20   Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims

21   made on or after September 29, 1999.

22          20.    The FCA, 31 U.S.C. § 3729(a)(1)(C)), makes any person who conspires to commit a

23   violation of the FCA liable for three times the amount of the damages the Government sustains and a

24   civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after

25   September 29, 1999.

26          21.    The FCA defines a "claim" to include any request or demand, whether under a contract

27   or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the

28   United States Government provides any portion of the money or property which is requested or

1 | demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any
2 | portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2).

3 |      22.    The FCA, 31 U.S.C. § 3729(b)(1) provides that "(1) the terms 'knowing' and
4 | 'knowingly' - (A) mean that a person, with respect to information - (i) has actual knowledge of the
5 | information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in
6 | reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent
7 | to defraud."

8 |      23.    The FCA, 31 U.S.C. § 3729(b)(4) provides that "(4) the term 'material' means having a
9 | natural tendency to influence, or be capable of influencing, the payment or receipt of money or
10 | property."

11 |

12 | **V.**

13 | **DEFENDANTS' CONTRACTUAL OBLIGATIONS AND CLAIMS FOR PAYMENT**

14 |      24.    Defendants submitted claims for payment pursuant to the contracts they entered into
15 | with the United States in connection with their aerospace components manufacturing and distribution
16 | business.

17 |      25.    Defendant Eaton serves its federal clients through two Government Services
18 | Administration contracts: GS-07F-9460G for "Power Distribution Equipment and Services" and GS-
19 | 06F-0023R for Facilities Maintenance and Management.  Based on Defendant's website
20 | (https://www.eaton.com/ecm/groups/public/@pub/@electrical/documents/content/sa08310017e.pdf),
21 | Defendant has "held [these contracts] for many years and millions of dollars of sales to federal
22 | customers." Defendant further regards the renewal of these contracts as "testimony to the high ethical
23 | standards with which we strive to serve our government customers and the value we place on
24 | satisfying their needs." Defendant's website goes on to list the benefits to clients of doing business
25 | with Defendant through its GSA contracts.  Specifically, Defendant guarantees "Value pricing for
26 | wide range of electrical equipment; Prices already negotiated; Full, fair set of terms of conditions in
27 | place," that "Eaton GSA contract meets all Federal Acquisition Regulation (FAR) requirements," and
28 |

1    that the contracts are "available for use by state agencies in some states [and] some local governments

2    for disaster preparedness."

3        26.    Based on publicly available data, 2,283 federal contracts have been awarded to

4    Defendants under GS-07F-9460G and 235 federal contracts have been awarded under GS-06F-0023R.

5    While the specific contract provisions of GS-07F-9460G have not been made publicly available in

6    GSA's eLibrary, the GovTribe listing for the contract reports a "Combined Dollars Obligated" amount

7    of $291.5 million since it was awarded to Defendant Eaton on March 1, 1997.  Defendant Eaton

8    Corporation's profile in the GovTribe database shows 5,422 total federal contract awards, evidencing

9    thousands of additional federal contracts awarded to Defendant outside of the two GSA contracts.

10   However, this number is likely a gross underestimate of the true total number of federal contracts

11   awarded to Defendant and all its subsidiaries and divisions.  Indeed, Defendant Eaton Aerospace

12   LLC's profile in the GovTribe database reports 920 additional, independent federal contract awards.

13   The profile for Eaton Corporation – Fluid Power DIV (Fluid and Electrical Distribution Division)

14   reports 635 independent federal contract awards.  Based on these two examples, it seems safe to

15   conclude that Defendants have thousands more federal contract awards than the 5,422 reported for

16   Defendants' umbrella company Eaton Corporation.

17       27.    The terms of GS-06F-0023R are publicly available in GSA's e-Library and, upon

18   further examination of the contractual provisions, it is virtually certain that Defendants have breached

19   at least one of their obligations to the federal government by failing to report their labor hour

20   miscalculations and refund federal clients for consequently inflated charges.

21       28.    Clause 52.203-13 Contractor Code of Business Ethics and Conduct (OCT 2015)

22   provides, "The Contractor shall exercise due diligence to prevent and detect criminal conduct; and

23   otherwise promote an organizational culture that encourages ethical conduct and a commitment to

24   compliance with law."  The clause further obligates Defendants to "timely disclose, in writing, to the

25   agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in

26   connection with the award, performance, or closeout of this contract or any subcontract thereunder, the

27   Contract has credible evidence that a principal, employee, agent, or subcontractor of the Contractor

28   has committed a violation of the civil False Claims Act (31 U.S.C. 3729-3733)."  Under this clause,

Defendants are also bound to establish an "internal control system," "establish standards and procedures to facilitate timely discovery of improper conduct in connection with Government contracts; and ensure corrective measures are promptly instituted and carried out." It is apparent from the internal emails attached hereto as electronic exhibits that Defendants did exercise due diligence – though perhaps too little too late – in discovering the cause of the labor hour calculation errors. However, what is also made clear from these emails is that, instead of promoting an "organizational culture that encourages ethical conduct and a commitment to compliance with law," Defendants' leadership attempted and instructed their subordinates to quietly rectify the calculation errors without notifying the clients who had previously been overcharged as a result of the miscalculations.

29.    Clause 552.215-72 Price Adjustment – Failure to Provide Accurate Information (AUG 1997) provides in relevant part, "The Government, at its election, may reduce the price of this contract or contract modification if the Contracting Officer determines after award of this contract or contract modification that the price negotiated was increased by a significant amount because the Contractor failed to submit information that was current, accurate, and complete; or disclose changes in the Contractor's commercial pricelist(s), discounts or discounting policies which occurred after the original submission and prior to the completion of negotiations." Further, the provision specifies, "If any reduction in the contract price under this clause reduces the price for items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States – (1) the amount of the overpayment; and (2) simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective each quarter prescribed by the Secretary of Treasury under 26 U.S.C. 6621(a)(2)." Defendants have materially breached this provision by failing to repay its federal clients overcharged amounts resulting from internal systematic errors in Defendants' labor hour calculations and for entirely failing to notify the Government of the errors immediately upon their discovery by Defendants' analysts.

30.    Clause 52.233-3 Protest After Award (AUG 1996) provides in relevant part, "If, as the result of the Contractor's intentional or negligent misstatement, misrepresentation, or miscertification, a protest related to this contract is sustained, and the Government pays costs, as provided in FAR

1  33.102(b)(2), or 33.104(h)(1), the Government may require the Contractor to reimburse the
2  Government the amount of such costs."

3      31.    Clause 552.238-81 Price Reductions (MAY 2019) provides, "The Government may
4  request from the Contractor, and the Contractor may provide to the Government, a temporary or
5  permanent price reduction at any time during the contract period." Alternatively, the "Contractor may
6  offer the Contracting Officer a voluntary price reduction at any time during the contract period."

7      32.    The above two clauses provide two options, which may have perhaps worked
8  concurrently, by which Defendants could have remedied the overcharges they billed to the
9  Government after discovering the labor hour miscalculations. Should Defendants now claim that they
10 lacked contractual avenues to notify and reimburse their federal clients, and to amend the contract
11 price should the Government have still expected full performance, it is clear from the language of
12 these clauses that Defendants certainly had means of doing so and fulfilling their good faith
13 obligations. Defendants' misconduct lies in the willfulness with which they concealed material billing
14 information during the course of active federal contracts and proposal negotiations for future federal
15 awards.

16     33.    The above two clauses provide two options, which may have worked concurrently, by
17 which Defendants could have remedied the overcharges they billed to the Government after
18 discovering the labor hour miscalculations. Should Defendants now claim that they lacked contractual
19 avenues to notify and reimburse their federal clients, and to amend the contract price should the
20 Government have still expected full performance, it is clear from the language of these clauses that
21 Defendants certainly had means of doing so and fulfilling their good faith obligations. Defendants'
22 misconduct lies in the willfulness with which they concealed material billing information during the
23 course of active federal contracts and proposal negotiations for future federal awards.

24     34.    According to the GovTribe database, Defendant Eaton Aerospace serves its federal
25 clients, specifically the Department of Defense ("DOD") through the Naval Supply Systems
26 Command, on the Sikorsky CH-53K "King Stallion" project through nine federal contract awards.
27 The contract prices range from $44,751 to $1,757,59. The "Place[s] of Performance" listed for seven
28 of the nine contracts are located in California, specifically in Los Angeles and Irvine. The terms of the

contracts were not found to be publicly available, however, all nine contracts have "Firm Fixed Price" pricing types, suggesting that the terms are likely similar, if not identical, to the provisions of the GSA contract. If such is the case, Relator hereby provides direct evidence that Defendants have defrauded the federal government through breaches of its contracts for the Sikorsky CH-53K program.

35.     Defendant Eaton Aerospace services its federal clients, specifically the DOD through the Naval Supply Systems Command, Aviation, and Land and Maritime divisions, on the McDonnell Douglas F/A-18 Hornet program through 67 federal contracts. The contract prices range from $25,323 to $1,486,975. The "Place of Performance" listed for almost half of these contracts is California, USA. The terms of the contracts were not found to be publicly available, however, all 67 contracts have "Firm Fixed Price" pricing types, suggesting that the terms are likely similar, if not identical, to the provisions of the GSA contract. If such is the case, Relator hereby provides direct evidence that Defendants have defrauded the federal government through breaches of its contracts for the "F-18" program.

36.     Defendant Eaton Aerospace services its federal clients, specifically the DOD through the Naval Air Warfare Center, Defense Contract Management Agency, and Aviation division, on the Bell Boeing V-22 Osprey program through 23 federal contracts. The contract prices range from $2,479 to $1,231,172. The "Place of Performance" listed for almost half of these contracts is California, USA. The terms of the contracts were not found to be publicly available, however, all 67 contracts have "Firm Fixed Price" pricing types, suggesting that the terms are likely similar, if not identical, to the provisions of the GSA contract. If such is the case, Relator hereby provides direct evidence that Defendants have defrauded the federal government through breaches of its contracts for the "V-22" program.

37.     While Relator does not possess extensive evidence of Defendants' specific claims for payment from the federal government, it can be deduced from the contract terms that Defendants have presented millions of dollars worth of false claims to the government for payment within the contract periods.

///

///

1

2

## VI.

### DEFENDANTS' FRAUDULENT SCHEME

3    38.    Defendants and their agents have operated and conspired to defraud the United States.

4    In 2017, Sikorsky Aircraft Corporation – one of Defendants' major contractors – initiated an analysis

5    of labor hours and costs associated with their existing contracts for production of parts for the

6    Sikorsky CH-53K, the "world's premier heavy lift helicopter." According to Defendants' website,

7    starting in 2005, Defendants engaged with Sikorsky's CH-53K Development Team and engineers to

8    identify life-cycle costs, development risks, recurring costs, and non-recurring engineering costs

9    associated with manufacturing the required systems and components. According to a news release

10   issued by Defendants on November 6, 2007, Sikorsky selected Eaton as the sub-contractor to provide

11   the Primary Hydraulic System, Integrated Fuel System, and Cockpit Lighted Control Panels for each

12   CH-53K. Defendants' contract with Sikorsky also included on-site engineering support. Based on the

13   expected production of more than 156 helicopters for the U.S. Marine Corps, the contract for the

14   Integrated Fuel System alone was valued at approximately $96 million and, when combined with

15   anticipated foreign military sales, was expected to exceed $160 million over the 12-year expected life

16   of the program.

17   39.    Brad Morton, "President of the Aerospace Segment," reported in a telephone interview

18   that the fuel system contract would bring in $360 million of revenue to Defendants. Morton reports

19   that the contracts for Sikorsky's Hydraulic Power Generation System and other fluid-related

20   conveyance systems, which were also finalized earlier in 2007, were worth about $200 million. Thus,

21   in total, Morton estimated that the entire CH-53K project would be worth $360 million to Defendants

22   for the Marine Corps orders, as well as "likely additional sales to other branches of the U.S. military

23   and          to          other          nations'          militaries"          (see

24   https://www.cleveland.com/business/2007/11/eaton_opens_mexico_city_office.html).          Today,

25   Defendants have "one of the largest on-site technical and program management staff of any supplier"

26   in the CH-53K program.

27   40.    When Sikorsky requested the labor analysis in 2017 with the intention of reducing labor

28   costs, it fell on Relator to run some of the consequent analyses and tests. Upon receiving the results of

FALSE CLAIMS ACT *QUI TAM* COMPLAINT

1    these tests, Relator found and flagged numerous issues within Defendants' labor reporting system.
2    Specifically, Relator was alerted to a pattern of hour reporting errors whereby Defendants' employees
3    would clock in to begin working on one particular operation while, in reality, they would perform
4    tasks for multiple other operations during the recorded time period for just that one operation.  The
5    correct protocol is for employees to clock in and out for each separate operation they work on in order
6    to most accurately record labor hours and charge clients for work performed.  This protocol must be
7    strictly adhered to because Defendants' internal labor monitoring system automatically adds a
8    predetermined standard number of labor hours if an employee fails to clock in to an operation, thus
9    explaining why Defendants' labor hour calculations were improperly doubled or otherwise overstated.
10   Essentially, Defendants were overestimating hours and improperly overcharging their prime
11   contractors and government clients for labor that was not performed.

12        41.     Once he identified the root cause of the reporting errors, Relator immediately notified
13   the Vice President of Finance of his findings and urged him to notify all clients and contractors who
14   had been overcharged, reimburse these clients for labor not performed, and rectify the issue in the
15   reporting system.  Relator also pointed out that these errors reflected negatively on Defendants'
16   management because it is the operations managers' responsibility to monitor and ensure employees are
17   logging their work hours correctly, especially for government contracts.  As a result of his
18   communication, Relator recalls being chastised and instructed to "stay quiet."  Relator was told that he
19   could not do anything based on these findings, however, Relator refused to sign off on a certification
20   of operation for the CH-53K program.  Relator's manager then circumvented him and signed off on
21   the certification.

22        42.     When Relator began his leave of absence, Defendants barred his access to his work
23   emails.  However, Relator is aware that the issue with the inflated hours estimates has since been fixed
24   in the reporting system but that Defendants have refused to notify or reimburse previously
25   overcharged clients and contractors.  Relator estimates that the total monetary loss due to Defendants'
26   fraud in the CH-53K program alone totals in the millions of dollars and that these practices continued
27   for at least 5-10 years.  Given that the CH-53K program is one of many contracts between Defendants
28   and Sikorsky, and given that Sikorsky is but one of many of Defendants' prime contractors and clients,

1    Defendants have likely profited millions from their overestimation of labor hours and consequent
2    overcharging of clients for work not performed.

3        43.    Relator is in possession of emails from a Senior Pricing Manager in Defendants' Fuel
4    & Motion Control Systems Division regarding contract negotiations with Boeing and instructing
5    Relator to "make adjustments to the labor hours as needed to stay compliant."  It is unclear from that
6    particular email whether the Senior Pricing Manager sought to stay compliant with industry
7    regulations or with the terms of the ongoing negotiations, however, the Manager also stated, "Before
8    settling we need to understand the impact of the labor issue on these proposals. We won't be able to
9    certify to the negotiations until that impact [assessment] is complete."  The "labor issue" referenced by
10   the Manager is the same body of errors discovered by Relator when he performed the labor analysis
11   for the Sikorsky contract.

12       44.    Relator notes that this labor issue surfaced in a number of Defendants' other programs,
13   including Boeing F-18, UTAS F35, and V22.  Relator identified one operation – "ETL" – for which
14   this error occurred most frequently but notes that there were other operations for which employees did
15   not accurately clock in and out to record actual labor hours worked.  In other words, the error was not
16   operation-specific and affected many other projects and programs.  Relator is also in possession of
17   email chains between Defendants' other Senior Pricing Analysts discussing and attaching extensive
18   spreadsheets with columns reflecting "Original" and "Corrected" labor hours.  Relator has produced
19   another email from one of Defendants' Cost Accountants in which he reports, "Finance did an analysis
20   also. 1,969 hours are total errors from our findings."  Further, Relator has collected emails between
21   Defendants' employees discussing significant reductions on proposals in programs that Defendants
22   supported for many years previously.  In another email, Relator reported to members of Defendants'
23   management team that the labor for the CH-53K proposal submitted to the federal government was
24   overstated by $764,904.  In response to Relator's email, a Vice President of Finance conceded,
25   "Obviously this a sensitive issue that will need to be fully vetted before deciding on the proper course
26   of action."  The VP goes on to caution the other recipients, "Until I've had the chance to review the
27   details with the team, please refrain from further/broader distribution or communication on the issue
28   and/or its potential impact."

45.     Additionally, Relator possesses an email from a Vice President of Finance who, in Relator's words, "did not want to open up a can of worms by informing the customer of labor errors so they would not question past proposals or other programs." In that email, the VP requested that the language in the "BOE" clause of a proposal to Sikorsky be revised to exclude the phrase, "Labor data was normalized to eliminate outliers and labor charging errors." When another employee responded to the email saying that particular proposal had already been sent to the client, the VP cautioned, "We'll need to be a little more sensitive to our wording for future releases." In another email, one of Defendants' Plant Controllers suggested to the same VP that, "rather than cancel and send [Sikorsky] into more of an alert," they should reframe their upcoming meeting with Sikorsky representatives as a discussion of the "potential 'savings' on the program based on the time studies." Presumably, this employee was suggesting that Defendants might clandestinely rectify their overblown charges and labor hour estimates by offering Sikorsky a reduction in their original proposal and pitching it as a "savings" opportunity.

46.     These emails evidence the fact that, rather than notifying and reimbursing prior clients for inflated past charges attributable to the "labor issue" in the reporting system, Defendants opted to retroactively adjust labor hours, thereby concealing their prior overestimations and fraudulent charges, and simply reduce new proposals moving forward. Relator also notes that, not only are Defendants obligated to notify and reimburse past affected clients and contractors, but Defendants must also correct past proposals based on these overblown hours estimates.

## VII.

## CLAIM FOR RELIEF

### Violations of the Federal False Claims Act

### [31 U.S.C. § 3729(a)(1)(A), (B), and (C)]

### [Against All Defendants]

47.     Relator hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

///

- 15 -
FALSE CLAIMS ACT *QUI TAM* COMPLAINT

1    48.    This is a claim for treble damages and civil penalties under the Federal False Claims

2    Act, 31 U.S.C. §§ 3729-3733.

3    49.    Through the acts above, Defendants and their agents and employees knowingly

4    presented and caused to be presented to officers, employees, or agents of the United States false or

5    fraudulent claims over-charging clients for the manufacturing and distribution of aerospace systems

6    and components, technical and engineering support services, and continuing contracts for such

7    products and services.  As a result of these illegal schemes, these claims were improper in whole

8    pursuant to 31 U.S.C. § 3729(a)(1)(A)-(B).

9    50.    These claims were also false or fraudulent and the statements and records were false

10   because they were monetarily excessive, in violation of 31 U.S.C. § 3729(a)(1)(A)-(B).

11   51.    Defendants, through the means described above, deliberately and intentionally

12   concealed material information, including the false and fraudulent nature of the claims, from officers,

13   employees, or agents of the United States in order to induce payment of the false and fraudulent

14   claims.

15   52.    Through the acts and omissions described in this Complaint, Defendants, with their

16   agents and employees and with persons known and unknown, knowingly agreed and conspired to

17   defraud the federal government by having false or fraudulent statements, records, and claims

18   submitted to, paid and approved by officers, employees, or agents of the United States.  Said actions

19   constitute violations of 31 U.S.C. § 3729(a)(1)(C).

20   53.    The United States, unaware of the falsity of the records, statements, and claims made or

21   submitted by Defendants and their agents and employees, paid and, on information and belief, have

22   paid and continue to pay Defendants for claims that would not be paid if the truth were known.

23   54.    As a direct result of Defendants' false records, statements, claims, and omissions, the

24   United States has been damaged in the amount of likely millions of dollars in false expenses for Eaton

25   Corporation's aerospace systems and components, technical and engineering support services, and

26   continuing contracts for such products and services.

27   ///

28   ///

# VIII.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States, hereby pray for judgment as follows:

1.  That Defendants cease and desist from violating 31 U.S.C. §§ 3729-3733.

2.  That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant of $11,000 for each violation of the FCA.

3.  That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4.  That Relator recover all costs of this action, with interest, including attorneys' fees and the costs to the United States for its expenses related to this action;

5.  For pre-judgment interest on all damages awarded;

6.  That the United States and Relator recover such further and additional relief as the Court deems just and proper.

DATED:  September 30, 2020        By: _____

**WILSHIRE LAW FIRM**
Justin F. Marquez
Thiago Coelho
April Yang

Attorneys for Relator
STEPHEN DAVIS

///
///
///
///
///
///
///

1

**DEMAND FOR TRIAL BY JURY**

2

Relators hereby demand a trial by jury for all claims that are so triable.

3

4    DATED:  September 30, 2020                 By:

5                                                      **WILSHIRE LAW FIRM**
                                                        Justin F. Marquez
6                                                      Thiago Coelho
                                                        April Yang
7

8                                                      Attorneys for Relator
                                                        STEPHEN DAVIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Valpro Attorney Services**
**Corporate Address:**
**1500 W. EL Camino Ave #510**
**Sacramento, CA 95833**
**Toll Free: 855-5VALPRO | 855-582-5776**
**Fax: 866-900-4665**
**Web: www.ValproAttorneyServices.com**
**Email: Service@ValproAttorneyServices.com**

Civil Clerk,

Please file the attached Civil Cover Sheet and Qui Tam Complaint that is under seal. Please provide one filed endorsed copy and mail it back to us in the SASE. If you have any issues or concerns don't hesitate to call us.

Thank you

Henry



**Valpro Attorney Services
Corporate Address:
1500 W. EL Camino Ave #510
Sacramento CA 95833**







**United States District Court, Central
District of California, Clerk of Court
255 E. Temple Street, Suite TS-134
Los Angeles, CA 90012-3332**

– CIVIL CLERK



PRIORITY MAIL

US POSTAGE
$ 008.00⁰
SEP 30 2020
MAILED FROM ZIP CODE 95833

02 1P
0002600383

CLERK, U.S. DISTRICT COURT

OCT - 5 2020

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

...alpro Attorney Services
...orporate Address:
...00 W. EL Camino Ave #510
...acramento CA 95833

United States District Court, Central
District of California, Clerk of Court
255 E. Temple Street, Suite TS-134
Los Angeles, CA 90012-3332

- CIVIL CLERK